# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SYLVIA C. | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 19 C 0624 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| ANDREW SAUL, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Sylvia C., moves for summary judgment seeking reversal or remand of the final decision of defendant, the Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits ("DIB") (doc. # 14: Pl.'s Summ. J. Mot.; doc. # 15: Pl.'s Summ. J. Mem.). The Commissioner has filed a cross motion for summary judgment asking us to affirm his decision (doc. # 19: Def.'s Summ. J. Mot.; doc. # 20: Def.'s Summ. J. Mem.), and Ms. C. has filed a reply (doc. # 21: Pl.'s Reply). For the following reasons, we grant Ms. C.'s motion, deny the Commissioner's motion, and remand the case for further proceedings.

## I.

On April 8, 2015, Ms. C. applied for DIB, alleging disability beginning on December 26, 2014 due to the following illnesses, injuries, or conditions: degenerative disc disease, bulging discs, fibromyalgia, migraines, muscle spasms, REM sleep disorder, issue with knee cartilage, anxiety, restless leg syndrome, plantar fasciitis, chronic nerve pain in her wrist, asthma, depression,

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Commissioner of Social Security Andrew Saul as the named defendant.

[2] On February 25, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 8).

anemia, obesity, rosacea, eczema, allergies, vertigo, gastroesophageal reflux disease (GERD), irritable bowel syndrome (IBS), gastritis, pinched nerve in her neck, and fissure hemorrhoids (R. 85-86, 96, 198-99).[3] The Social Security Administration ("SSA") denied Ms. C.'s application at the initial and reconsideration stages of review, after which Ms. C. requested a hearing before an Administrative Law Judge ("ALJ") (R. 96, 113-27). On June 13, 2017, the ALJ held a hearing at which Ms. C., represented by counsel, and a vocational expert ("VE") testified (R. 49-84). On January 23, 2018, the ALJ issued a decision denying Ms. C.'s DIB claim (R. 14-45). The Appeals Council denied Ms. C.'s request for review, making the ALJ's decision the final word of the Commissioner (R. 1-5). *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); 20 C.F.R. § 404.981.

## II.

Ms. C. was born on August 25, 1978 (R. 183). She is a divorced mother of four children, who were 20, 17, 13, and 2 years old in June 2017 (R. 55, 63). Ms. C. obtained an associate degree in 2004, and she worked as a teller, loan payment processor, and loan booking specialist in a bank's loan department for about six years (R. 54-56, 199-200, 215). Ms. C. then worked as a hospital phlebotomist from February 2010 or 2011 until December 26, 2014, when she stopped working because of her conditions (R. 56, 199-200, 215).[4] Ms. C. has not worked at a level of substantial gainful activity since then (R. 19).

The medical evidence in this case spans several hundred pages. However, because the ALJ's treatment of Ms. C.'s symptom allegations—as set forth in reports submitted to the SSA

---

[3] An April 21, 2015 summary of Ms. C.'s application identified the alleged disability onset date as January 1, 2015 (R. 183), but we use the December 26, 2014 date because that is what the ALJ used in rendering his decision (*see, e.g.*, R. 17, 19, 39).

[4] When Ms. C. stopped working, she was slightly more than 35 weeks pregnant (R. 704-06). She gave birth in late January 2015 (R. 59, 445).

and in Ms. C.'s hearing testimony—compels our decision in this case, we focus on that category of evidence. We therefore discuss the medical evidence only to the extent it is necessary to explain our rationale.

### A.

In June 2015, Ms. C. completed a function report in which she described her illnesses and conditions, her abilities, and her daily activities (*see* R. 225-33). In describing what she did from the time she wakes up until the time she goes to bed, Ms. C. reported that she basically just tries to feed her baby, change a few diapers, and look after her older children (R. 226). However, she cannot do much for the older three children because it takes everything she has to feed and take care of the baby (*Id.*). Ms. C. also reported that it hurts sometimes to dress herself and that she avoids bathing because of pain (*Id.*). Ms. C. mainly prepares frozen dinners, as she cannot make anything that takes time, but if she is "having an OK day," she will make meals for the next day or days (R. 227). Ms. C. reported that she only goes outside when she must buy food or necessities, and that she goes shopping for food and medications one or two days a week (R. 228).

### B.

Ms. C. also testified at the June 13, 2017 hearing before the ALJ. Ms. C. testified that she left her job in December 2014 both because she was pregnant with her youngest child and because "it was very difficult because of [her] other illnesses on top of a pregnancy. I just – I couldn't handle it and my doctor told me to go home" (R. 59). Ms. C. testified that for the past two-and-a-half years, she had experienced all-day, unbearable pain that generally rates between a six and an eight out of ten (R. 58-59). According to Ms. C., she does not really have a postural position in which she can remain comfortable—she eventually experiences pain while sitting, standing, walking, or lying down (R. 74-75). Ms. C. is also afraid to be around other people because of the

3

pain that would result if someone bumped into her (R. 62, 74). Although Ms. C. takes various medications, including Norco, so that she can sleep without waking up a lot due to pain, she never sleeps through the entire night (R. 74-75).

Ms. C. testified that she can walk "[m]aybe one" block, which would take five to ten minutes, but if she walks farther, she starts limping more, her feet start hurting more, her hips, back, and neck hurts, and she gets headaches (R. 57-58). If Ms. C. were to go to work, she would have problems sitting, standing, moving around, climbing stairs, and writing or typing (R. 69). Ms. C. believed that she could not perform physical activity, such as walking, for longer than five minutes before she would have to stop (R. 64). She does not really do much else other than walking because anytime she has tried to do more, it ended badly (*Id.*). As an example, Ms. C. recounted an episode that took place less than a month before the hearing where she tried to go to the mall with her children (R. 64-65). Ms. C. and her children only went to two stores before they had to leave and Ms. C. "basically could not move" (*Id.*). Ms. C. thereafter "had to take a Norco every six hours for two days to be able to get up and just eat and go to the bathroom" (R. 65). Ms. C. further testified that after watching her daughter play in the yard for about a half hour while standing, she has to come into the house and usually take a painkiller because she cannot stand that long without getting pain in her left foot, hip, and back (*Id.*).

Ms. C. also explained that she has struggled with depression and anxiety most of her life (R. 62). When asked by the ALJ to recount "what's going on in your life," Ms. C. testified that with her depression and anxiety, she feels kind of unstable most of the time; her memory is pretty bad; she has a hard time focusing; she cannot do things that normal people can do; she has panic attacks and anxiety when she is around a lot of people; and she has a really hard time in crowds and gets nervous that someone will touch her and cause her pain—in short, she is "just kind of

living a half-life" (R. 62). Due to problems with concentration, Ms. C. has problems reading and understanding what people are saying (R. 75-76).

Ms. C. testified that she has been "in and out of Rosecrance," with her treatment starting a year-and-a-half before the hearing (R. 62).[5] As part of her treatment at Rosecrance, Ms. C. goes to weekly group therapy sessions (at the time of the hearing, she had just completed a program on anxiety and was then participating in a program on stress), she sees a therapist every week or two, and she sees the psychiatrist every few months or more (R. 63). Ms. C.'s mental health treatment also includes prescribed medication: Duloxetine, Clonazepam or Klonopin, and Lorazepam or Ativan (*Id.*). Those medications do not consistently control her conditions (*Id.*).

As for her daily activities, Ms. C. testified that she goes to Target once a week and to Woodman's (a supermarket) once a week (R. 54-55, 63-64). Sometimes she will take her son to school in the morning, but "that's pretty much it" (R. 63-64). She never, for instance, attends parent/teacher conferences because she's afraid that there will be too many people and if someone bumps her, it will cause too much pain (R. 74). She bought a gym membership for the family, but only visited the gym four to five times over six months (R. 67-68). When asked what a "good day" looked like for her, Ms. C. testified that she could "get up and cook for my kids and get dressed. Actually change out of my clothes. And take a shower" (R. 69-70).

Finally, Ms. C. testified about her family. Her 20-year-old son does things that scare her and "cause extreme stress for" her, and her 17-year-old daughter has behavior issues (R. 72). Ms. C.'s 13-year-old is autistic, and Ms. C. believes that her 2-year-old is most likely autistic as well (R. 67, 70-71). Ms. C. has lived with her 17-year-old, 13-year-old, and 2-year-old children in her

---

[5] In July 2015, Ms. C.'s primary care physician referred her to Rosecrance Ware Center (R. 592), which is an "[a]dult mental health and substance use treatment facility." Rosecrance Ware Center, Rockford, IL | Locations, https://rosecrance.org/rosecrance-ware-center/ (last visited Feb. 18, 2020).

parents' house since October 2016 (R. 55, 60). Ms. C. testified that taking care of her two-year-old is "a joint effort between me, my mother, my father, my daughter, and my son, and me" (R. 60). Her parents, however, are pressuring her to get her own place and a job and "[t]hey don't want me and my kids there" (R. 70).

## C.

In denying Ms. C.'s claims, the ALJ followed the familiar five-step process for assessing disability. *See* 20 C.F.R. § 404.1520(a). As an initial matter, the ALJ determined that Ms. C.'s date last insured was June 30, 2018 (R. 19). Then, at Step One, the ALJ determined that Ms. C. had not engaged in substantial gainful activity since her alleged disability onset date, December 26, 2014 (*Id.*). At Step Two, the ALJ determined that Ms. C. suffered from nine severe impairments: fibromyalgia, morbid obesity, degenerative disc disease, trochanteric bursitis, asthma, migraine headaches, sleep apnea, generalized anxiety, and a mood disorder (*Id.*). The ALJ also determined that Ms. C. suffered from seven additional impairments -- plantar fasciitis, cognitive disorder, IBS, GERD, status/post anal fissure repair, hypothyroidism, and right median neuritis – that he found were not severe (R. 20). At Step Three, the ALJ determined that none of Ms. C.'s impairments, individually or in combination, met or equaled a listed impairment (*Id.*). As part of his Step Two and Step Three analyses, the ALJ used the "special technique" to evaluate the severity of Ms. C.'s mental impairments. *See Craft v. Astrue*, 539 F.3d 668, 674-75 (7th Cir. 2008); 20 C.F.R. § 404.1520a. In doing so, the ALJ determined that Ms. C. had moderate limitation in the following functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself (R. 22-25).

Between Steps Three and Four, the ALJ evaluated Ms. C.'s residual functional capacity ("RFC"). *See* 20 C.F.R. § 404.1520(a)(4). The ALJ concluded that Ms. C. retains the RFC to

perform sedentary work as defined in 20 C.F.R. § 404.1567(a) subject to several additional limitations (R. 25).[6] Specifically, Ms. C. can only occasionally use ramps and stairs, stoop, crouch, crawl, kneel, and balance; she can never use ladders, ropes, or scaffolds; she cannot be around unprotected heights, heavy equipment, operating machinery, hazards, or concentrations of dust, fumes, odors, or temperature extremes; she can understand, remember, and apply simple information; she can adapt to routine changes in the work process or shifts in priority; she can perform routine work that stays the same day-to-day; she should avoid public contact, team coordination, and more than occasional interaction with co-workers and supervisors; and she can work five days per week, eight hours per day, at a consistent pace with only normal breaks (*Id.*) At Step Four, the ALJ found that Ms. C. could not perform any past relevant work (R. 37). At Step Five, however, the ALJ found that Ms. C. could perform other jobs that exist in substantial numbers in the national economy, such as parts assembler (DOT 713.687-018) and parts inspector/sorter (DOT 720.684-050) (R. 38-39). Thus, the ALJ concluded that Ms. C. was not disabled (R. 39).

### III.

Courts review ALJ decisions deferentially to determine if they apply the correct legal standard and are supported by substantial evidence. *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). To satisfy the "substantial evidence" standard, "the ALJ must build an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (internal citations and quotations omitted). "Although this Court

---

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). For sedentary work, "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday" SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

reviews the record as a whole, it cannot substitute its own judgment for that of the [ALJ] by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Ms. C. argues that the ALJ's decision should be reversed and remanded because the ALJ (1) crafted an RFC that failed to properly accommodate her fibromyalgia, obesity, and non-exertional limitations; (2) improperly evaluated her subjective symptom allegations; (3) erroneously assessed the opinion evidence in the record; and (4) based his Step Five determination upon unreliable vocational testimony (Pl.'s Summ. J. Mem. at 5-15). We agree that the ALJ did not properly assess Ms. C.'s subjective symptom allegations. Because we find remand necessary on this basis, we do not reach Ms. C.'s additional arguments for remand.

## IV.

We will overturn an ALJ's subjective symptom assessment "only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). At the same time, that standard does not empower a court to uphold a subjective symptom assessment if the ALJ fails to build an "accurate and logical bridge" between the evidence and her conclusions. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *see Fisher v. Berryhill*, 760 F. App'x 471, 476 (7th Cir. 2019) (a ruling is not supported by substantial evidence if the ALJ "fails to build a logical and accurate bridge between the evidence and conclusion"). For instance, this requisite bridge is lacking when the ALJ's conclusion is based on a misinterpretation of the evidence. *See Fisher*, 760 F. App'x at 477 (finding that a conclusion based on a mischaracterization of the record lacked "a logical link between the evidence and [the] conclusion"); *see also Kaminski v. Berryhill*, 894 F.3d 870, 874 (7th Cir. 2018) (explaining that a decision premised on an "incorrect interpretation

of the medical evidence" is "not supported by substantial evidence"). In the end, an ALJ "must adequately explain [her subjective symptom assessment] by discussing specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and a failure to do so "is grounds for reversal." *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015).

### A.

The ALJ concluded that Ms. C.'s "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record" (R. 29). In evaluating a claimant's allegations, an ALJ may rely upon inconsistencies between the allegations and other aspects of the evidentiary record. *See* 20 C.F.R. § 404.1529(c)(4) (directing ALJs to consider inconsistencies when making subjective symptom assessments); SSR 16-3p, 2016 WL 1119029, at *7 (noting that if a claimant's symptom allegations "are inconsistent with the objective medical evidence and the other evidence," the ALJ will find that the claimant's "symptoms are less likely to reduce his" ability to work). But here, the ALJ's decision to discount Ms. C.'s symptom allegations on the basis of purported inconsistencies in the record was flawed in several respects.

*First*, the ALJ found inconsistencies in the record because Ms. C. only "stopped work due to pregnancy, not a permanent severe medically determinable impairment," and she previously had been able to work as a bank teller, a loan clerk, and a phlebotomist "[d]espite depression, anxiety and instability that allegedly had gone on her entire life, ... which is inconsistent with the life-long instability [Ms. C.] described" (R. 28). At the outset, we note that the ALJ found at Step Four that Ms. C. could not perform the kinds of jobs she had held in the past. That finding reflects that Ms. C.'s condition as of the onset date of December 26, 2014 – which was the date on which she

stopped working – had not previously resulted in the level of limitation that she was experiencing as of that date.

Moreover, in reaching his conclusion the ALJ miscast the testimony that Ms. C. offered. Ms. C. did not testify that she stopped working only because of her pregnancy; she testified that "it was very difficult *because of [her] other illnesses* on top of a pregnancy" and she "couldn't handle it and [her] doctor told [her] to go home" (R. 59) (emphasis added). Contrary to the ALJ's understanding, Ms. C.'s testimony indicates that her impairments in fact contributed to her decision to stop working.

Ms. C. also did not testify that she could work despite "life-long instability." The ALJ asked Ms. C. what is going on in her life and why she might not work if she was offered employment—questions both phrased in the present tense (R. 61-62). Ms. C. responded that with her depression and anxiety, "most of the time I feel kind of unstable," and she identified several other symptoms that contributed to this instability: bad memory; problems focusing; inability to play with her kids, work out, and do things that "normal people can do"; and panic attacks when being around a lot of people (R. 62). Then, the ALJ asked whether "this depression, this anxiety, this state of mind came out of nowhere," to which Ms. C. responded that she had "struggled with depression and anxiety most of [her] life" (R. 62). This testimony in no way suggests that the degree of instability Ms. C. testified about when asked about her current state had been present throughout her entire working life. Moreover, "[t]here is no inherent inconsistency in being both employed and disabled," and "[r]egularly working while impaired does not disprove a person's limitations[.]" *Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016); *Knapp v. Berryhill*, 741 F. App'x 324, 329 (7th Cir. 2018). A person can be depressed and anxious "yet still perform full-time work." *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). Ms. C.'s prior ability to hold

down a job while struggling with depression and anxiety simply is not an inconsistency that warrants discrediting her allegations.

*Second*, the ALJ found that Ms. C.'s report that there was substantial stress because her father wanted her to move "did not conform closely with hearing testimony to the effect that childcare was a joint effort involving only limited participation by the claimant and heavy contribution by her parents" (R. 30). But we do not see any hearing testimony of this sort. The closest we have found is the following question-and-answer exchange between the ALJ and Ms. C.: "Q. Who is taking care of the two-year-old? A. It's a joint effort between me, my mother, my father, my daughter, and my son, and me" (R. 60). Nowhere in this answer does Ms. C. say that her parents heavily contribute to this effort or that her own participation is limited. Nor did Ms. C. testify that her parents welcomed any additional burden of having Ms. C. and her children live with them.

*Third*, the ALJ erroneously concluded that Ms. C.'s daily activities were inconsistent with her symptom statements (R. 34-35). The ALJ recited statements made by Ms. C. in her June 2015 function report that she had difficulty performing personal care activities, such as dressing, bathing, shaving, feeding herself, and using the toilet; that she was limited to preparing frozen meals; and that she was unable to perform any household chores (R. 34-35 (citing R. 226-27)). The ALJ then purported to contrast those statements with (1) Ms. C.'s statement to a consulting psychologist in August 2015 that she spent her days taking care of her children (R. 35 (citing R. 471)); and (2) Ms. C.'s hearing testimony that she cooks for her children on good days, that she gets dressed, and performs personal care activities (R. 35).

But taking care of one's children is a necessity, not a "household chore." *See Gentle*, 430 F.3d at 867. What is more, Ms. C.'s August 2015 report that she spends her days taking care of

her children is consistent with her June 2015 function report. In that earlier report, Ms. C. explained that from the time she wakes up until she goes to bed, she basically just tries to feed her baby, change a few diapers, and look after her older children (R. 226). She also noted that she takes care of her four children, but she cannot do much for her older three children because it takes everything she has to feed and take care of the baby (*Id.*).

Nor is there any inconsistency between Ms. C.'s hearing testimony and her prior reports. The ALJ asked Ms. C. what a *good* day looked like; she answered that it is "being able to get up and cook for my kids and get dressed. Actually change out of my clothes. And take a shower" (R. 69-70). That Ms. C. could change her clothes and take a shower on a good day does not mean that she could do so all the time, or even most of the time. This is especially true given that Ms. C. suffers from fibromyalgia, depression, and anxiety, the symptoms of which often wax and wane. *See Gebauer v. Saul*, --- F. App'x ----, 2020 WL 261231, at *5 (7th Cir. Jan. 17, 2020) (fibromyalgia symptoms can wax and wane); *Lamont v. Astrue*, No. 09 C 1640, 2012 WL 929616, at *16 (N.D. Ill. Mar. 19, 2012) ("[A] person who suffers from depression or anxiety will have good days and bad days"). Critically, the function report filled out by Ms. C. did not ask for an explanation about her ability to care for herself on a good day or when she is at her best (R. 226). As for Ms. C.'s testimony that she could cook for her kids, this is consistent with her report that she mainly prepared frozen dinners and that if she was "*having an OK day*, I'll make meals for [the] next day or days" (R. 227) (emphasis added). And based on our review of the evidence, we find it unlikely that Ms. C. intended the word "cook" to suggest something more involved (like preparing a gourmet meal), *cf. Joe R. v. Berryhill*, 363 F. Supp. 3d 876, 884 (N.D. Ill. 2019) (common sense plays a role in Social Security cases), but to the extent the ALJ believed she did, he certainly should have followed up on this point.

*Finally*, the ALJ noted that Ms. C. "allegedly does not leave the house 'much' until one cumulatively starts to count the occasions when she addresses her children's medical needs or their well-being needs, in particular because two of her children are autistic" (R. 31). The ALJ's apparent belief that Ms. C. went out more than she alleged because of her children's needs, however, is based on mere speculation. *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("[A] decision based on speculation is not supported by substantial evidence"); *see also Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018) (discouraging "stray, unsupported conjecture" from the ALJ). Notably, the ALJ does not cite to any evidence showing how often Ms. C. and her children must leave home to address any of the children's medical issues, let alone any issues stemming from autism.

### B.

We cannot say that these flaws are harmless. *See Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) (explaining that harmless errors "do not require (or indeed permit) the reviewing court to upset the agency's decision"). Although an ALJ's subjective symptom assessment need not be perfect, *see, e.g.*, *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009), the ALJ's errors here were substantial and numerous enough that they make us question the ALJ's assessment of Ms. C.'s allegations as a whole. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) ("The administrative law judge based his [subjective symptom assessment] on a variety of considerations but three of them were mistaken. Whether he would have made the same determination had he not erred in these respects is speculative"). Most of the erroneous conclusions we have identified involve the ALJ's misreading or mischaracterization of evidence in the record, and we are not confident that the ALJ would evaluate Ms. C.'s subjective symptom allegations in the same way once he *accurately* recounts and considers Ms. C.'s hearing testimony and reports.

*See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) ("An error is harmless only if we are convinced that the ALJ would reach the same result on remand"); *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (a flawed credibility assessment could not be deemed harmless where the court could not "be sure that the ALJ would have reached the same conclusion about [the claimant's] credibility if the information he considered had been accurate"). Thus, remand is required.[7]

All of this is not to say that the ALJ on remand must credit all of Ms. C.'s subjective symptom allegations. The ALJ should evaluate Ms. C.'s subjective symptom allegations in accordance with SSR 16-3p, *i.e.*, by explaining "which of [Ms. C.'s] symptoms [are] found consistent or inconsistent with the evidence . . . and how [the ALJ's] evaluation of [Ms. C.'s] symptoms led to [her] conclusions." SSR 16-3p, 2016 WL 1119029, at *8. Ultimately, the ALJ must ensure that her subjective symptom evaluation builds an accurate and logical bridge from the evidence to his conclusions in a way that a reviewing court can trace his path of reasoning. *See Clifford v. Apfel*, 227 F.3d 863, 872, 874 (7th Cir. 2000). But the requisite bridge is missing from the ALJ's current decision, so we must remand. *See Minnick*, 775 F.3d at 937 ("Without a logical bridge between the evidence and the ALJ's conclusion, we lack a sufficient basis upon which to uphold the ALJ's determination of [the claimant's] credibility"); *Shramek*, 226 F.3d at 811.

## V.

After the ALJ re-evaluates Ms. C.'s subjective symptom allegations, he will have to re-assess Ms. C.'s RFC. *Pierce*, 739 F.3d at 1051 ("[O]n remand the determination of residual functional capacity . . . will need a fresh look after a new evaluation of the credibility of [the

---

[7] Although not directly related to his assessment of Ms. C.'s allegations, we also question the accuracy of the ALJ's characterization of Ms. C.'s mental health treatment as "limited" (R. 36). Ms. C. underwent mental health assessments in July 2015 and July 2016 (R. 639-52, 903-18), attended numerous individual and group therapy sessions between July 2015 and February 2017 (*see, e.g.*, R. 591-660, 844-931) and was prescribed several medications to treat her anxiety and depression (*see, e.g.*, R. 658-59, 904, 910).

claimant's] complaints of disabling pain"). We note the following for the ALJ's consideration in doing so.

*First*, this is a case where the ALJ found that Ms. C. suffers from sixteen physical and mental impairments, both severe (nine) and non-severe (seven) (R. 19-20). *See Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019) ("[T]he ALJ must [] consider the limitations imposed by all impairments, severe and non-severe"). Among these impairments are conditions—fibromyalgia, anxiety, and mood and cognitive disorders—that are "marked by subjective and fluctuating symptoms." *See Gebauer*, 2020 WL 261231, at *3 (fibromyalgia); *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) ("[P]sychiatric assessments normally are based primarily on what the patient tells the psychiatrist"); *Lamont*, 2012 WL 929616, at *16 ("[A] person who suffers from depression or anxiety will have good days and bad days"). To aid in the assessment of Ms. C.'s RFC on remand, the ALJ should consider obtaining the opinion of a medical expert, who can "be especially helpful when evaluating the severity of" such conditions. *Gebauer*, 2020 WL 261231, at *3. Moreover, the evidentiary record indicates that Ms. C.'s physical impairments affect her mental state (*see, e.g.*, R. 62 ("I guess it's kind of hard not to be so depressed when I'm not even 40 and I can't even play with my kids"); R. 592 ("[Ms. C.] reports serious medical conditions which have an affect on her mental health and her ability to cope with significant life stressors"). A medical expert may be well-positioned to review the medical record and opine about the *combined* effect of Ms. C.'s physical and mental impairments on her ability to work. *See Martinez v. Astrue*, 630 F.3d 693, 697–98 (7th Cir. 2011) (faulting the ALJ for not considering the interaction of the claimant's physical and mental problems because "[e]ven if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling").

*Second*, the current evidentiary record contains medical opinions and assessments from non-examining state agency consultants (R. 85-95, 97-112) as well as consultants who examined Ms. C., albeit only one time (R. 471-76, 774-75). In weighing these opinions on remand, the ALJ should ensure that he does not discount the opinions of the examining consultants on the basis that they saw Ms. C. only one time while, at the same time, giving greater weight to the opinions of state agency consultants who never saw Ms. C. *See Paul v. Berryhill*, 760 F. App'x 460, 464 (7th Cir. 2019) (finding that the ALJ wrongly discounted the opinion of an examining physician "for being based on a one-time examination" when, at the same time, he gave "great weight" to the opinion of a non-examining physician).

*Third*, the ALJ should keep in mind that Ms. C.'s mother need not be "trained to make medical observations" before she can accurately report on whether Ms. C. can perform personal care activities, prepare her own meals, get along with family members, or engage in other daily activities, as this reporting does not require the making of medical findings or observations (*see* R. 36). Indeed, "[t]he regulations permit testimony from 'other persons' such as family members without requiring them to have medical training." *Teschner v. Colvin*, No. 15 CV 6634, 2016 WL 7104280, at *9 (N.D. Ill. Dec. 6, 2016); *see also Michael M. v. Saul*, CIVIL NO. 1:19cv212, 2020 WL 57989, at *18 (N.D. Ind. Jan. 6, 2020) ("[T]he ALJ cannot simply disregard Plaintiff's wife's statements because she is not a medical professional"). Moreover, any individual providing a third-party report on behalf of a social security disability claimant is likely to be a relative, friend, or someone in a close relationship with the claimant, *i.e.*, someone who is "naturally partial" to the claimant (*see* R. 36). Yet the SSA expressly authorizes such reports. It would be both unfair and inefficient for the SSA to seek this type of third-party evidence and then automatically discount it based on the claimant's relationship with the third parties from whom the evidence is sought. *See*

*Roque v. Colvin*, No. 15 C 392, 2016 WL 1161292, at *5 (N.D. Ill. Mar. 22, 2016) (an ALJ cannot discredit a third party's statement based solely on his or her "relationship with the claimant and corresponding motivation or bias"; otherwise, "the statements of family members would never [be] given credit") (internal quotations and citations omitted); *see also Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013) (rejecting the implication that the testimony of the claimant's fiancée "must automatically be discounted for bias").

## CONCLUSION

For the foregoing reasons, we grant plaintiff Sylvia C.'s motion for summary judgment (doc. # 14) and deny defendant Commissioner's cross motion for summary judgment (doc. # 19). We remand the case for further proceedings consistent with this opinion. The case is terminated.

**ENTER:**

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: March 12, 2020**